**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**CENTRAL DIVISION**
**LEXINGTON**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **NO. 5:24-cr-00070-KKC-MAS-4** |
| ) | |
| **FRED BROBBEY AWUAH,** ) | |
| ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

**MEMORANDUM OPINION & ORDER**

Defendant Fred Brobbey Awuah ("Awuah") came before the undersigned for an initial appearance on April 29, 2026. [DE 55]. The United States moved to detain Awuah, and the Court conducted a detention hearing. Considering the record—including testimony, proffer, the Pretrial Services Report ("PSR"), and arguments—the Court finds that Awuah must be detained in accordance with the Bail Reform Act ("BRA") and shall grant the United States' motion for detention.

## I.    ANALYSIS

Awuah is charged with knowingly and voluntarily conspiring and agreeing to commit offenses against the United States in violation of 18 U.S.C. C. §§ 1956 and 1957. [DE 1]. At the initial appearance, the United States orally moved for pretrial detention pursuant to 18 U.S.C. §§ 3142(f)(2)(A). [DE 55]. The Court conducted a detention hearing on May 6, 2026. [DE 61].

**A.    LEGAL STANDARD FOR DETENTION UNDER THE BAIL REFORM ACT**

The Court afforded both sides all procedural rights outlined in the Bail Reform Act. The Government moved for detention under § 3142(f)(2)(A), urging that Awuah posed a serious risk of flight. 18 U.S.C. § 3142(f)(2)(A). Detention premised on nonappearance must rest on facts supported by a preponderance of the evidence. *See, e.g.*, *United States v. Patriarca*, 948 F.2d 789, 793 (1st Cir. 1991); *United States v. Curry*, No. 6:06-CR-82-DCR, 2006 WL 2037406, at *6 (E.D. Ky. July 18, 2006). Detention based on danger, however, demands clear and convincing evidence that no combination of conditions will reasonably ensure the safety of the community. 18 U.S.C. § 3142(f). Further, almost any conditional release ultimately depends on a court's assessment of a defendant's good faith intentions and predicted compliance with any imposed conditions. *See United States v. Tortora*, 922 F.2d 880, 887 (1st Cir. 1990) (evaluating predicted good faith compliance as a critical release component).

Evidence rules do not apply in the detention hearing context. 18 U.S.C. § 3142(f). The hearing is informal, and the Court may consider a wide range of proof, weighing the evidentiary reliability and accuracy. *See, e.g.*, *United States v. Webb*, 149 F.3d 1185 (Table), No. 98-1291, 1998 WL 381686, at *1 (6th Cir. June 22, 1998). However, the nature and quality of proof impacts its probative value and weight in the detention calculus. The § 3142(g) factors guide the analysis.

**B.    AWUAH'S RISK OF NONAPPEARANCE**

Collectively, the nature and circumstances of the instant offense, the weight of the risk of nonappearance evidence, and the history and characteristics of Awuah drive the detention analysis.[1]  First, the nature and circumstances of the offense in this case indicate some foundational nonappearance risk.

Chris Darmand, a forensic accountant with the Federal Bureau of Investigation, testified about the details of the alleged conduct underlying the Indictment as follows: In Summer 2022, the City of Lexington fell victim to a business email compromise scheme that resulted in the city wiring $3.9 million to a fraudulent account.  Upon further investigation, the FBI identified over 130 victims that were defrauded of approximately $13 million, through similar business email compromise schemes.  The FBI identified Nana Kwabena Amuah,[2] originally from Ghana but a citizen of the United States, who operated as the manager of multiple "employees" who opened and operated bank accounts used to receive fraudulent funds, and as a liaison to other individuals desiring to use those accounts.  According to Darmand, Awuah was a friend and employee of Amuah, who opened bank accounts and communicated the account information to other individuals who were committing business email compromise scams.  These interworkings are evidenced by encrypted chat communications between Awuah and Amuah about bank accounts and specific dollar amounts, which were located on Amuah's phone.

---

[1] The § 3142(g)(4) considerations do not bear on flight or nonappearance risk in this case. The Court considers that factor briefly in relation to its danger analysis, *supra*.

[2] Amuah was previously convicted and sentenced in this District in 5:23-CR-00001-KKC-HAI.

Additionally, the FBI located chats discussing the procurement of false identification documents, including one chat between Amuah and another convicted co-conspirator containing a specific image of a Utah driver's license carrying Awuah's photograph and the name "Luke Johnson." Darmand alleges that this license was used to open a bank account in Denver, Colorado, that was used to receive victim proceeds. Furthermore, Darmand indicated that there are bank records corroborating that Awuah was the individual receiving the victim money using the alias "Luke Johnson." Moreover, one specific bank account was opened in Colorado in April 2022, and travel records corroborate that Awuah traveled to Colorado at that time with Samuel Osei, a co-defendant in this case.

Darmand further identified evidence which demonstrates that Awuah likely derived specific proceeds from these schemes and accounts. For instance, from the accounts that the FBI is aware of Awuah opening, he withdrew approximately $98,000 in cash. Additionally, when the Dutch arrested Awuah, they conducted a search of his residence and recovered approximately €17,000 in cash, debit/credit cards in the names of individuals other than Awuah,[3] and many luxury items, including a Mercedes; Cartier watch; personalized necklaces; Christian Dior and Goyard bags; and Christian Louboutin, Louis Vuitton, and Prada shoes.[4]

Though the charged offense does not trigger a presumption of detention, it at least suggests a substantial ability to utilize international travel, false identification

---

[3] Darmand provided that these cards were likely used in conjunction with the false identification cards to withdraw proceeds from bank accounts.

[4] This includes a €950 pair of Louis Vuitton sneakers that were purchased the day before his arrest.

documents, and aliases to further criminal proceedings, which raises serious concerns about Awuah's nonappearance risk in this matter. *See United States v. Vysniuaskas*, No. 10-20717, 2011 WL 5433960, at *9 (E.D. Mich. Nov. 9, 2011) (citing as a flight risk indicator the defendants' "use of aliases allowed [that] them to avoid detection by law enforcement").

Moreover, Darmand testified that there is a history of flight in this case. Specifically, the FBI found evidence demonstrating that Awuah provided one of the accounts that was meant to receive funds from the specific scheme that targeted the City of Lexington. When Shimea Maret McDonald was arrested for her part in the scheme, the local news reported on the investigation. The FBI located chats between Amuah and Awuah in which Amuah sent the news story to Awuah and indicated that he intended to flee to Canada. Both individuals agreed on the importance of getting over the Canadian border to safety. Amuah was arrested on the train to Canada. Thus, although Awuah was not directly involved in Amuah's flight, he condoned and encouraged it. It is difficult for this Court to accept any argument that Awuah would now forego his own advice and remain in the United States pending future court proceedings.

The remaining factors germane to the risk of nonappearance—Awuah's history and characteristics and the weight of nonappearance evidence—logically merge in this scenario, as Awuah's background and current circumstances supply the pertinent proof. *Id.* §§ 3142(g)(2)–(3); *see also United States v. Sykes*, No. 04-cr-80623, 453 F. Supp. 3d 1011, 1015–16 (E.D. Mich. Apr. 13, 2020) (noting that, in this Circuit,

the § 3142(g)(2) factor looks only to the weight of the evidence that the defendant is a flight risk or a danger (citing *United States v. Stone*, 608 F.3d 939, 948 (6th Cir. 2010))); *accord United States v. Sanders*, 466 F. Supp. 3d 779, 785 (E.D. Mich. 2020). Section 3142(g)(3) requires courts to consider "the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings" and whether, at the time of the current offense the person was on probation or pretrial release.  18 U.S.C. § 3142(g)(3).  The evidence concerning Awuah's overall risk of nonappearance, though mixed, shows that Awuah (a non-citizen) has many connections abroad, possible incentives to flee, and uncertain living circumstances. The testimony provided at the detention hearing further reflects a pattern of deceptive behavior, including using aliases and false information to avoid detection. The § 3142(g)(2) and (g)(3) factors thus, for the reasons outlined below, together weigh in favor of detention.

Per the PSR, Awuah is a 34-year-old Dutch national who was initially born in Kumasi, Ghana. [PSR at 1]. When he was just four years old, Awuah's parents moved to the Netherlands, leaving Awuah behind in Ghana with his grandfather.  At seventeen, Awuah moved to the Netherlands to join his parents.  Awuah is now a Dutch citizen.  [PSR at 2].  Both of his parents currently reside in the Netherlands and remain Ghanaian citizens. Additionally, Awuah has five siblings who also live in the Netherlands; some are Ghanaian citizens, while others are Dutch citizens.

Further, Awuah has a girlfriend and six-month-old child, which both reside in the Netherlands. He does not have legal status in the United States. [PSR at 2]. However, if released, Awuah may reside with his cousin, Kingsley Appiah, in Texas. [PSR at 1].

Awuah reported completing high school in Ghana, Dutch language school in the Netherlands, and earning a Junior Account Management Degree at ID College in 2014. [PSR at 2]. His most recent employment ended in April 2025, when his extradition proceedings began. Awauh did not report any history of mental health issues or substance abuse disorder. Furthermore, Awuah's criminal history is relatively *de minimis*, consisting only of a charge for the receipt of stolen property in the Netherlands. Awuah was extradited to the United States for the purpose of this prosecution. According to the United States, when he was arrested, he was found in possession of evidence indicating the fraudulent use of aliases and false identification documents.

To begin the analysis, Awuah resided in the Netherlands for more than a decade, where his parents, siblings, girlfriend, and young child continue to reside. [PSR at 2]. Awuah's many family members offer international contacts that could, potentially, aid in flight efforts. *See* 18 U.S.C. § 3142(g)(3)(A) (considering a defendant's family ties, past conduct, and criminal history); *see also United States v. Sheikh*, 994 F. Supp. 2d 736, 741–42 (E.D.N.C. 2014) (finding that the defendant's family ties abroad and prior international travel weighed against pretrial release); *United States v. Townsend*, 897 F.2d 989, 995 (9th Cir. 1990) ("When assessing an

alien defendant's ties to the United States, factors to be considered include how long the defendant has resided in this country, whether defendant has been employed in the United States, whether defendant owns any property in this country, and whether defendant has any relatives who are United States residents or citizens."). Additionally, Awuah reported an extensive history of international travel with his Dutch passport, including previous trips to the United States, Ghana, Spain, Turkey, Dubai, and Curacao.  [PSR at 2]; *United States v. El-Hage*, 213 F.3d 74, 80 (2d Cir. 2000) (affirming district court determination that defendant was "quite capable of flight" where, *inter alia*, he had "extensive history of travel and residence in other countries."); *Sheikh*, 994 F. Supp. 2d at 741–42.  Testimony presented during the detention hearing indicated that Awuah frequently traveled between the Netherlands and the United States in furtherance of the alleged criminal acts.  While visiting, he would stay with the previously convicted Nana Amuah.  Moreover, Awuah's contacts within this district are nonexistent, and his contacts within this nation are incredibly limited, consisting only of his cousin in Texas.

Furthermore, the PSR and record reflect that an ICE detainer—*i.e.*, an internal administrative directive from one Executive Branch department to another concerning Defendant's precise custodian—is in place.  [PSR at 2].  The detainer is not dispositive of the detention question in this case; rather, it simply is additional evidence of Defendant's precarious immigration status, and to that extent, is probative (but not determinative) as to potential nonappearance risk.  *See, e.g.*, *United States v. Veloz-Alonso*, 910 F.3d 266, 269–70 (6th Cir. 2018) (emphasizing that

the BRA and immigration analyses are distinct); *United States v. Adomako,* 150 F. Supp. 2d 1302, 1307 (M.D. Fla. 2001) (observing that even "a deportable alien" is not categorically "barred from release" under the BRA, but noting that immigration status remains a factor to weigh in the flight analysis "to the extent that the government chooses to present it in support of its motion for detention").

Although Awuah's lack of criminal history, mental health issues, and substance abuse disorder are to his credit, these facts are overridden by Awuah's lack of a stable residence in the United States, recent employment, and ties to this district—and no realistic plan to obtain the latter two—which, when coupled with his history of international travel and ties, cause the second and third factors in § 3142(g) to point towards the necessity of a nonappearance-based detention.

Finally, the Court must consider "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g)(4). Here, the primary danger is that Awuah will abscond to a foreign country and evade prosecution altogether. He would then be free to continue to commit similar crimes as charged here, victimizing Americans. While the Court is not undertaking a full danger analysis in this matter, the Court notes that the risk that Awuah would flee the country and fail to appear is high, and such flight poses the risk that he will never have to answer for any crimes he may have committed against American citizens and provides the opportunity for him to participate in new criminal conduct.

Perhaps most importantly, the Court is not confident that there is any condition or combination of conditions that will ensure Awuah's appearance at future proceedings. As a part of a plan for his potential release, Awuah submitted that, if released, he could live with his cousin, Kingsley Appiah, in Texas. According to Awauh, Appiah is a naturalized United States citizen, who runs a small business in Texas. Awuah's proposed residence with Appiah, located far from this district, is itself concerning; moreover, the United States argues that the arrangement presents even more concerns. Specifically, the United States presented testimony indicating that on at least two occasions various co-conspirators, including Amuah, sent Appiah funds in the amounts of $5,400 and $9,000. Thus, the government insinuates that Appiah was previously involved in, or profited from, related criminal activity. The Court agrees that remanding Awuah to the home of an individual who, at the very least, turned a blind eye to criminal activity raises serious concerns. And even if the Court did not allow Awuah to reside with Appiah, his release would leave him homeless in a district he was brought to by law enforcement. The potential housing concerns, when coupled with Awuah's Dutch citizenship, international ties, and lack of employment and ties to this district outweigh the Court's ability to fashion any conditions for him to be supervised on release. Even if the Court could craft such conditions, the Court has little belief that Awuah will abide by them, considering his encouragement of Amuah to flee to avoid potential criminal prosecution, and the many motivations for Awuah himself to flee back to his home country to avoid prosecution here.

Accordingly, the Court finds that the United States has shown by a preponderance of the evidence that no conditions can reasonably assure Awuah's appearance in this case. Detention on this basis is appropriate under the BRA.

### C.   AWUAH'S DANGER TO THE COMMUNITY

The United States did not make substantial arguments regarding Awuah's risk of danger to the community. Thus, the government did not meet the clear and convincing burden to detain Awuah based on an irremediable risk of danger to the community and danger-based detention is not proper under the BRA.

## II.   CONCLUSION

For the above-stated reasons, the Court finds the United States failed to prove by clear and convincing evidence that Awuah is an irremediable danger to the community but proved by a preponderance of the evidence that he poses a risk of nonappearance and the Bail Reform Act mandates detention.

The Court has assessed the record, contemplated the risks, evaluated conditions, and determined that no conditions exist that can reasonably assure that Awuah will appear in this case. Accordingly, the Court **GRANTS** the United States' oral motion for detention and **DETAINS** Defendant Awuah.

Signed this the 12th of May, 2026.



MATTHEW A. STINNETT
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF KENTUCKY